Please all rise. Dearly, dearly, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Robert A. McLaren presiding. Please be seated. Your Honor, the first case in the docket this morning is 2-24-0087. In the name of the Commitment of Joseph R. Racanelli, People of the State of Illinois, Petitioner at Leave, The Joseph R. Racanelli, Respondent, Appellant. Argument on behalf of the Appellant, Mr. John Podesta. Argument on behalf of the Appellant, Mr. Cameron, and the Appellant. Thank you, Mr. Rogasevich. You may proceed. Are you a second generation or are you... I'm a dude. More than a second generation. What I'm getting at is, are you the judge retired or... No, sir. No judge. Is there any relationship between you and... That's my father. My father is the judge retired. Okay. Thank you. Good morning. John Rogasevich on behalf of the Appellant, Joseph R. Racanelli. I may please the court.  Joseph R. Racanelli committed two sex offenses back-to-back in 2004 and 2005 when he was 17 and 18 years old. He was placed on probation for the first and violated probation by committing a second offense and went to prison on the second offense when he was 18. As he was nearing release in 2007, he was evaluated by an evaluator at the Department of Corrections. And based on that evaluation, he was detained for civil commitment under the SPP, the Sexually Violent Persons Act. At the time, he was 20, I think 21 years old at the time of his detention. The case didn't proceed to trial. He's now 39 or is he... I believe he's now 38 years old by my math. Yeah. The trial didn't proceed until 2019 when he was then 32, and he was ultimately committed or confined in a secure detention facility on an indefinite basis, so not pending anything further in 2023 when he was, I believe, 36 years old. Between his detention and trial, though, in that approximately 12-year period, he made significant progress in treatment. He's not someone who... He progressed up and down, right? He made some progress, and then depending upon which expert you look to, he made some progress, some significant progress. He made significant progress. He advanced, I think, through not just Phase I, Phase II, and Phase III. He was in Phase IV and during Phase V at the time of the trial. And unlike many people who were committed or detained under the SVP Act who refused to participate in treatment, he certainly wasn't one of them. He obviously impressed the internal staff at the TDF enough to advance through the program. And certainly when the evaluators looked after the fact, they differed on what that record showed and didn't show. There were some behavioral incidents. There were some fights. Not many, but there were some. And they differed in their opinions at trial. Now, at trial, the state... I guess the progress that he made was so significant that one of the DHS experts changed his opinion. He actually changed his opinion twice. He initially said that he thought that Mr. Lacanelli was never about the mental disorder. I think all the experts agreed on more or less on what the mental disorders... He meant the qualification. He meant the qualifying condition, but whether it was likely, substantially probable that he'd commit a sex offense in the future. Dr. Travis flipped back, heard about a behavioral incident, and changed his opinion again and said, well, actually, no, I think he is probably, substantially probable that he'd commit a sex offense in the future. But then interviewed Mr. Lacanelli, interviewed the therapist, got a fuller picture of what was going on, and changed his opinion back. And I think he testified at trial that he likes to stay informed as to the progress of everyone that he does an initial evaluation for while they're in DHS custody. So that brings us to the trial and then what occurred afterwards. And I'd like to address that first before I go into whether or not Dr. Levitt should have been permitted to testify on behalf of the state at trial. Because what happened afterwards was unusual. Mr. Lacanelli had filed several motions about the performance of his various attorneys. Mr. Schwartzbach. Mr. Schwartzbach first, then Ms. Snyder. That went kind of back and forth initially, right? Correct. Correct. Mr. Schwartzbach seemed like he very much wanted to stay on the case. He was given a continuance to speak to, but the defendant still ultimately said, I don't want to. Correct. I think it continued to file motions attacking Mr. Schwartzbach's performance. There's no allegation. You don't raise ineffective assistance for counsel. Correct. All the allegations that Mr. Lacanelli had made, you deemed meritless because you didn't raise them, right? Correct. I didn't think they had a chance of succeeding. Correct. So why don't we talk about the authority of the state to hire someone to expert. Okay. Under Section 35, the state, the procedures under the act for the appointment of various experts, both by the state and the defense. I'm going to pull up, actually, the language of the answer. It says may. State may. It says they may call one or the other. What about Section 25E? Section 25E about what the defense may or may not do. And what the state may. They have rights. It provides that the state may. And if the state has a right, the state, quote, unquote, Section 25E, right of person subject to petition, the state has the right to have the person evaluated by an expert chosen by the state. That's correct. They have the right to have that evaluation. And this court has said back in 2012, in rank commitment of Brown, they can get as many evaluations as they want from a DOC evaluator or a DHS evaluator. What matters is whether they can call that witness at trial. Certainly, if Dr. Levitt had been another DHS evaluator, so Dr. Travis changes the script on them shortly before trial, and they may call either the DOC evaluator or the DHS evaluator. In this case, they may not because he wasn't going to say what they wanted him to. They could have asked, I suppose, for DHS to prepare another evaluation. They did not. They went and hired Dr. Levitt, and the record is pretty clean that he was hired. He was not a DA. He did not have a DHS contract. He was selected by the state. He was a controlled witness and a controlled expert witness by the state. Now, in Session 35, when it's talking about trial and what happens at trial, not what happens when we're making petitions to determine detention or placement or who should advance where in treatment, but when we're talking about trial, it contains a limitation. It specifically recognizes that the state, that there are these various experts that have been appointed under the Act. Of course, the DOC evaluator, which is automatic, the attorney general probably doesn't know even that that evaluation is occurring. How is the word may, how do you make that into a limiting construction? So it says, if you may call, it does not limit the number or type of witnesses you may call. No, it doesn't on its face. However, when it's both of those, the complete sentence is the petitioner may present expert testimony from both the Illinois Department of Corrections evaluator and a Department of Human Services psychologist. So it's specifically talking about expert testimony. Now, I agree. In Hardin, the court said that while a parole officer can testify, the state can present evidence of the crimes that were committed. It falls under that rubric. And violations, because it could have a bearing on future dangerousness. But specifically when we're talking about expert testimony, the legislature could have said, and did not say, the petitioner may present expert testimony on the issue of dangerousness, period. And then they don't have to call the DOC evaluator. They can call anyone they want. You recognize that if that were the case, the General Assembly would have responded to Hardin and limited the expert testimony to those that are mentioned in the statute. Well, in Hardin, it was a parole officer. Right. But what is the difference? I mean, it talks about the witnesses you may call. It does not limit the type of witnesses you may call. And that was the essence of Hardin, isn't it? It is the essence of Hardin, that certainly the state has a right to present a case. But I think Hardin is based in part on Bean's language, 35B's language, that at the trial on the petition, shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments. And I think the parole officer falls under the punishments if any were imposed. And it's another witness that they could call talking about the crimes, and he was on term of mandatory supervisory release. And certainly violations could bear on dangerousness. However, but when there's a Mr. Rudacevich? Yes, Your Honor. I have a question. I'm sorry. I know I'm over here, and I apologize for not being there. We're talking 35B again, and you say the legislature could have said. Did the legislature enact any exclusions on 35B? Did they say you can't do this, or you can't do this, or you can't do that? Or did Hardin say that you could not call other witnesses? No, the legislature, it does not contain an explicit limitation.  Okay. However, when it says that the state may present expert testimony, and then it goes on to say from whom can they present expert testimony, and on what issue. It says from the Illinois Department of Corrections evaluator and the DHS psychologist. And those two people are A's that have been listed elsewhere in the act, the automatic mechanism for the evaluation six months before release by the DOC evaluator, and then upon entry to DHS after detention order by the DHS psychologist. So when they're talking about expert testimony, what form of expert testimony can be presented? And it would make sense for the state to be limited when they're filing a petition. It is an extraordinary remedy to detain someone after an offense has been punished by a term of imprisonment in the Department of Corrections. And the state has to introduce some competent evidence. It's not just that we don't like this guy, so let's get him. It's the experts are saying this person is dangerous. And certainly if the DOC evaluator says no, there's a mechanism for DHS to conduct a second evaluation. And if they both say no, I don't think the state has any evidence. I don't think they can go out and hire someone. I don't think they could bring in Dr. Levitt if those first two screenings went against them. I don't think they could pay someone to give them an opinion that they wanted, so they could indefinitely civilly commit someone. Counsel, I would like to ask a question. Are you arguing that the judge has the authority to allow the witness in question to testify under a standard of what? An abuse of discretion insofar as the judge's exercise is concerned? Is the statutory authority in the case law indicative that the question of legality has been decided and it's been determined that it is now a question of discretion and relevancy and materiality and competencies that are the benchmarks by which we should review this evidence? No, I think it should be reviewed under de novo review. I think that as a matter of law, Dr. Levitt, as an expert witness providing expert testimony on that issue, is prohibited by the act. I take Hardin and Brown as well, particularly Brown, to stand for the proposition that the state's not limited to what's in 35B. There's other evidence that they can present or testimony from other individuals they can present. Let me ask you this question. Neither party addressed this in Section 30C in their briefs, but it provides that, quote, notwithstanding the provisions of Section 10 of the Mental Health and Developmental Disabilities Confidentiality Act, all evaluations conducted pursuant to this act shall be admissible at all proceedings held pursuant to this act, including a probable cause hearing and the trial. Doesn't this language expressly allow the admission of any report prepared by the state's expert and, by extension, permit the expert to testify regarding the evaluations? Certainly, it would seem to suggest that at first blush. Right. That's what the act says. I think what it's discussing is, I mean, is... You can just use the reports. That's your position, right? You can use the reports of another evaluator that's appointed at the state's request to cross-examine? Correct. Either cross-examine or, frankly, He could have provided Dr. Levitt's evaluation to Dr. Travis or to someone else and said... And introduced the report itself without any commentary by the expert that prepared the report? Correct. So the defendant would be deprived of the right of cross-examination of the person who prepared that report? That would be inconsistent with the defendant's right to confront? Maybe, maybe not. In this context, expert reports from other experts are considered by testifying experts all the time. Isn't the preference to have a live witness testify, especially an expert witness, isn't that the preference generally?  So the underlying bases of their opinions can be explored on cross-examination?  However, under 35B, I think generally, I would make this... I would say this with respect to the interplay between 30 and 35. 30 is kind of the general provision about confidentiality of reports and evaluations and what could be later introduced. And 35B... Judge, if I just may finish. Yeah, go ahead. ...is specifically about the expert testimony that may be presented at under 35 is trial. Not other hearings, not other proceedings, trial. And that specifically talks about expert testimony. With respect to... If I can...  We look at the overall context. We look at all of the... The entire record, right, with respect to the trial courts? Yes, absolutely. Okay. Absolutely. So it's a determined... Any other questions? Sue, do you have any questions? Well, I do, and it's similar to the one I asked before. Assuming that 30C says that these reports are admissible in all other proceedings, which would encompass trial, is there anything in that authority, in that section, that specifically excludes Dr. Levitt's report? Well, to be frank, I'd have to look at Section 30 again. That's what I'm about to do when I sit down. But if it's talking about a report and not the testimony of a witness, if it's talking about a report, then what I said before holds, that Dr. Levitt can present his report to Dr. Nikolai. Dr. Nikolai may agree or disagree, and she can talk about the contents of his report when rendering her opinion at trial. And she can say whether it influenced her or not and whether she agrees with it or not. And certainly if it's talking about reports, that's what Section 30 would mean, not testimony, the trial testimony. Thank you. Pardon me. Thank you. You will have an opportunity to make rebuttal. Thank you. Mr. Williams, you may proceed. Good morning, Your Honors. Good morning. Thank you. And may it please the Court, Assistant Attorney General Aaron Williams on behalf of the people. So as I said at the outset, I'm happy to answer questions about any of the issues in our briefs and the people's motion to dismiss for lack of jurisdiction. But unless there are questions about the latter, I will limit my remarks today to the issues discussed in the briefs. With regarding the admissibility of Dr. Levitt's trial testimony, I think I can be brief because this Court has already addressed this issue. By its express term, Section 35B of the Act merely says that the people may present testimony from both the DHS psychologist and the IDOC evaluator. It does not say that it may only present testimony from those experts. This Court has rejected the argument that it means that and it's even clearer now that it does not mean that. Now that Section 25E also provides that people have a right to have the respondent evaluated before trial by an expert of their choosing, which there would be no reason to do. And there would be no reason additionally to make that expert's report admissible at trial explicitly if that expert were categorically prohibited from testifying at trial, as respondent argues. That would raise a cooperative issue, right? I believe it would, yes. The defendant wouldn't be able to cross-examine the witness who prepared the report or the expert who prepared the report. Yes, yes. And under respondent's argument, it's curious if the respondent would have the authority even to waive the statutory prohibition on this expert's testimony that he argues the legislature placed on their testimony in Section 35B. So for those reasons, the trial court correctly concluded that nothing in the SVP Act barred Dr. Levitt's trial testimony. Regarding respondent's post-trial waiver of counsel, respondent did knowingly and voluntarily waive the right to counsel after trial, specifically in March 2023. Two weeks earlier, the trial court denied his request to appoint other counsel outside the public defender's office, and he stated three times in that hearing that he was unwilling to accept representation by the public defender and that he would be forced to go pro se and wanted another lawyer. That's pages 22, 35, through 37 of the record. Then the court admonished him about the various risks of proceeding pro se and at his request gave him two weeks to think about whether he wanted to go pro se. Two weeks later, he said at the start of the next hearing that he had spoken to counsel, he thought about it, and he decided, yes, I wish to go pro se. And then the court said he felt he would be forced to go pro se so that he was not denied certain things, including his own copies of trial transcripts. Then... He never requested counsel after that, right? No, he did not. Importantly, in the next hearing, after the court accepted his waiver of counsel, in May 2023, he explicitly said that he waived counsel and that he had always communicated that he would rather go pro se, this is a quote that's 22, 77 of the record, rather than accepting representation by the public defender, and that he always, that he was always against representation from counsel, meaning appointed counsel. In your brief, you contend that Respondent's statement that, quote, he was willing to keep counsel reflected only a conditional willingness to do so if counsel supplied him copies of the trial transcript. Didn't the Illinois Supreme Court reject a similar argument in Burton? There, the court affirmed the trial court's finding that the defendant not clearly and unequivocally invoked his right to self-representation. No. So the facts in, that was Burton, the facts in Burton were distinct, essentially the opposite. So in Burton, there the trial court, there the Illinois Supreme Court affirmed the trial court's decision to deny, he never actually made, the conclusion that he never made a clear and unequivocal request to represent himself. There, the defendant's statement that he wanted to represent himself was purely conditional. He said he wouldn't want to represent himself unless the court, unless his appointed counsel gave him certain records. But there, his counsel did give that defendant the records in question. So the conditions upon which he said he wanted, would have wanted to represent himself were not fulfilled. Here, by contrast, this Respondent did clearly and unequivocally waive the right to counsel or said that he wanted to represent himself earlier in that March 2023 hearing. He said, I wish to represent myself. Yes, I wish to represent myself. And then his conditional statement that he would be willing to keep appointed counsel if the, if trial counsel gave him his own copies of trial transcripts. That condition was not fulfilled because as he explained at the beginning of the hearing, that was part of the reason why he wanted to represent himself. Trial counsel had not given him his own copies of trial transcripts. So this was merely a hypothetical statement of his possible willingness to keep his counsel if things were different. But things weren't different as he had explained. So he later reaffirmed that he wanted to go pro se. And he did, yes. Yes, clearly and repeatedly. And so for those reasons, the record as a whole does show that he truly desired to represent himself. And would you agree that the record reflects the frustration by the trial court with the defendant's decision? The court repeatedly admonished him and said, it's not a good idea. Oh, certainly. Yes, yes. They admonished him twice before, yes, that he, that it was a bad idea. And then afterward, it repeatedly said that it was a bad idea that he decided to do this. And at any one of those times, the court said, yes, you are prejudiced because of this. So that at the end of the March 2023 hearing, you've made a mistake by deciding to go alone. It said that, again, many more times throughout the proceedings. And at no point did he ever say that he wanted to take it back, which the trial court, to which the trial court gave every indication that it would have been amenable. So to doing it because it would have. What about his right to be present? Was there sufficient evidence for the trial court to rule that his decision was voluntary? Yes. Yes, there was. Nor did the trial court. It was just an e-mail, wasn't it? Yes. So, yes, the prosecutor received an e-mail from staff at the TDF, the DHS facility where he was held, that respondent refused to attend the hearing and that he refused to sign a form acknowledging his refusal. And the respondent knew about the date of this hearing, of course, because the trial court had explained when the hearing was during the previous hearing in October 2023. And then, yes, and then additionally, beyond the mere addition, additionally, in addition to the e-mail, there was also respondent's prior conduct over the last four years since his trial, which the trial court found, showed that his refusal to appear was a reflection of his intent to postpone his commitment order, as he had been doing for four years at that point. And the record is replete with evidence supporting that determination, that he desired to delay his commitment. And the trial court also had an adequate basis to find that respondent was not willing to participate in conditional release, which supported his decision to order the only other available disposition, which was secure treatment in an institutional setting. As it told him it would during the previous hearing if he did not take conditional release, which was being offered to him. And the record was clear that he did not want conditional release? Eventually, it was clear at the time of his dispositional hearing. It was pretty clear already. So in October 2023, the hearing before that, the trial court explained that it was prepared to grant conditional release that if he wanted conditional release, it would order DHS to prepare a conditional release plan. And then if he agreed to follow that plan, it would conditionally release him. This dispositional hearing was a little unusual, and it would have been even if he had shown up, because there was so little in dispute here. Respondent, the people did not dispute the evaluator's recommendation that respondent was suitable for conditional release. And the only thing that made him inappropriate for conditional release was that he had repeatedly said in the past that he was not willing to participate in it, that he would refuse to participate in it. And so the only question at the dispositional hearing was whether he had changed his mind. The trial court gave him a chance to think about that. And by refusing to show up at the hearing, he indicated that he had not changed his mind. And so there was an adequate basis to find that he did not want conditional release. And if it were otherwise, he always could have filed a motion to reconsider, which he likewise could have done if he wanted to dispute the trial court's finding, which it made clear in its commitment order that it sent him that he had refused to appear. He did not. And if respondent had wanted conditional release, he could have simply said so during the previous hearing in October 2023, and then it would have started the process of conditional release then. There would have been no need for any of this. So for those reasons – Excuse me. All right. Counsel, is the record fairly clear that aside from this conditional release issue, that he had met most of the other conditions for at least release on conditional release? There weren't any roadblocks at that point that were red flags or warning signs? That's right, Your Honor. Yes. So the expert who wrote the predispositional evaluation report, the PDI, Dr. Hernandez opined that that respondent could be safely managed in the community, that there were conditions adequate to do that. The people did not dispute that opinion. And the trial court explicitly said in its order that it accepted that part of its opinion. It made the finding that he could be safely managed in the community. So the only thing that made him inappropriate for conditional release was that he didn't want it and that he was not willing to participate in it. Would it be safe to say that the defendant or the respondent's position is that he wanted to get out home free as opposed to changing environments, even though there were still conditions placed upon him in an alternative or outside environment? Yes, Your Honor. I think that's entirely fair to say. So does that show any indication of false logic? Possibly, yes. It was not the most logical decision. It certainly was not always in his best interest, no. And the trial court certainly did not think it was in his best interest. But like the decision to waive counsel, which is usually not in a defendant or a CR respondent's best interest, that is the respondent's choice. And ultimately, the trial court certainly did not use its discretion by not ordering conditional release when respondent was not willing to comply with the conditions of release, which would then just have to be revoked later if he violated those conditions. So it was ultimately up to him, as the trial court said. All right. Unless there are any further questions, for those reasons and those in our briefs, I would ask the Court to affirm the trial court's judgment. Anybody have any other questions? I'm fine, thank you. Thank you. Thank you, Your Honors. Mr. Ratasevich, you may make your rebuttal. Thank you, Your Honor. If the Court does nothing else, you have to reverse, at a better manner, the secure detention order. This notion that Mr. Racanelli did not want or was not willing to do conditional release is fictitious and bogus. Certainly, as he said, when he was in a pretrial posture and was still trying to secure his freedom, unconditional freedom, as I would hope everyone in detention anywhere wants, he made statements that he didn't want conditional release. But significantly, on the 21st of September, 2023, that last date before the October 27th hearing, the judge says, well, listen, I've been uploaded two orders. One says secure detention. One says conditional release. I'll read them to you. It's your choice. Which one do you want? Well, first of all, there's nothing in Section 40 that makes the conditional release, the defense consent to conditional release a prerequisite to imposing it on someone. The conditions are ours. It's not some great thing. It shouldn't be. It shouldn't be. Right. But it is the least restrictive. And the question, the only question before the court is, is it appropriate under the circumstances? Now, certainly you can take into consideration if someone says, well, I'm going to violate it if you send me out. That's not what he was saying. He said he didn't want it. He wanted unsecure. He wanted to be totally free. And on September 21st, the attorney general brought, says this. I'm going to quote all this. I thought Mr. Racanelli was under the impression and had received the report because he said previously he was not going to accept conditional release. Okay, so that's what Mr. Racanelli responds. I have made statements in general to people down here that I would not take CR. I have made those statements. Then you've made statements in court saying that you know that I don't want CR. And from there, we wasn't at this point because I had faith in the court and in the court system that somebody will hear me out where I'm not SBP. And none of this other stuff. It wouldn't even matter. So that's my thinking. But clearly, now we are at that stage. But I haven't received it. I know they've sent me documents before. He says, well, listen, we're in a different posture now. Before I was saying I didn't want it because I wanted to be out. I didn't want to be SBP. And at the very end, just at 2371, the judge says, you know, hey, this is going to be up to you. Do you want this? He actually says, but it's up to you. If you think sitting in Rush Bill is a good idea, and the judge makes the context, there's CR, conditional release versus secure detention. He says, no, I want my freedom, Judge. Enough is enough. He's way near my flag. And then the predisposition report that was prepared in January, January of 2023, Dr. Hernandez says on page 12 of that report, it's in the impounded record at 78, when asked to discuss his future plans for release into the community, conditional release, Mr. Racanelli stated, I want to get out, do everything I'm allowed to do, abide by the rules, get a job, talk to my family, and work towards discharge to be with family and live a healthy life. When asked about what he still needed to do to be ready for conditional release, Mr. Racanelli said, I'm ready. I've been ready. Okay, so there's nothing in the predisposition report that would suggest that he doesn't want conditional release. In fact, it suggests the exact opposite. And other than the recantation that Judge Baconiak considered the report, as he knows he is supposed to do, there's nothing to suggest that he actually had to write this report other than that there were two orders that were presented to him, and he told Racanelli, sir, you can have this one or you can have this one. Which is it? He says, I just want to read the report, Judge. I want to read the report. Now, on that next date, again, the notion that he refused transport, there's an email by someone we don't know who said it saying something we don't know was actually said. Isn't the trial court entitled to relying on representations of counsel? To an extent. To an extent. But when Mr. Racanelli had been there each and every time, he had just been not only months earlier permitted or forced to go pro se. You're not suggesting the state misrepresented? Judge, I've been in these courtrooms, and the term refusal is thrown around. I'm not suggesting in any way, but there's no suggestion that the state was misrepresenting the email. Is there? I don't think the state was purposely misrepresenting anything. What I think, though, when they said that he didn't sign the refusal form, and Mr. Racanelli later writes to the court, says that they would not transport me. It's not like he refused, I won't get on the bus. He said they wouldn't bring me. They said I didn't have court. Any other questions? No, thank you. Sue? No, I don't. Thank you. Mr. Radacevic, is there something inherently wrong with the trial court giving him options and insofar as the option that he chose, that there was some error committed by the court? Yes, the error committed by the court was that the court was required to impose the least restrictive, placing them in the least restrictive environment. All the evidence suggested that the least restrictive environment was conditional release. The court decided to not impose conditional release because it made a determination that I believe was unwarranted that he refused transport, and then because he refused transport, refused to participate, and refused to be placed on CR, when I don't think the evidence in the record supports that determination either. It's certainly not the statutory factors that the court should consider. I thought I heard that he was asked if he would accept the rules regarding what he must do if he is placed on conditional release, and he said, no, I don't want conditional release with conditions. Did I misunderstand what I thought I heard you say? No, that's not what he said. What did he say? He was talking about an earlier phase, years ago, like in 2018, 2017, what he had said then, when he still hoped to be found not to be an SVP at all. Mind you, at the same time, he was working through all four phases of the program. It's not as though he's saying, I don't want to participate in any treatment, I don't want anything. He's like, I'm doing this treatment because I'm focused on getting out of here. I'm focused on recovering and being no longer impaired. I don't want the moniker SVP. I don't want those rules. I don't want conditional release. I want release. That's the context. There was no motion to reconsider. The defendant filed the notice of appeal. He didn't move to reconsider the court's ruling, correct? He didn't, but he had filed, that was at that point, his third motion. If I may, just for the record, the last two were from the clerk, were from the circuit clerk. Those were not from Mr. Racanelli.  Thanks. Am I understanding your argument to be that not only was the trial court's decision in error, but he misinterpreted what your client said on the record? Absolutely, he misinterpreted. He said the exact opposite. He said, I'm ready for release. Yeah, I did. We're at a different phase now. I'm ready for release. And when you told the evaluator, the evaluator went over that with him. So if we agree with you based upon your oral argument, we should reverse. And if you find that the record reflects otherwise, we should affirm? Absolutely. Please look at the record. Please look at the record. The record's going to support my argument. Okay. Any other questions?  Thank you. Thank you. We'll take the case under advisement. There will be a short recess.